The next case now, which is J.C. Penney v. Oxford Mall. Mr. Boney. Good morning, Your Honor. Please, the Court. I'm Lindsay Boney for the appellant, Oxford Mall, and I'll be reserving three minutes of my time for rebuttal, if I may. The Court should reverse the sanctions against Oxford Mall because the District Court misapplied the legal standard. Focusing on what are called an improper motive or Oxford Mall's bad intentions without evidentiary support for either of those things, instead of the relevant standard laid out in Purchasing Power of conduct that is so egregious that it could only be committed in bad faith. Now, there may have been carelessness or inattentiveness in this case, but not egregious conduct, much less clear and convincing evidence to meet what Purchasing Power calls this narrow exception path for inherent power sanctions. Now, certainly it was not an ideal situation. It was inefficient, and it wasted judicial resources for the parties to litigate for 26 months only to determine new jurisdiction, and it's understandable the courts— Okay, inefficient and a waste of judicial resources. Oxford knew from the Hibbitt litigation, or at least was on notice, that there was an issue regarding jurisdiction. So, how is that not just bad faith in terms of ignoring the implication on this case as opposed to an inefficiency which you described? It's a fair question, Your Honor, and a couple of different responses, I suppose. In September and October of 2019, this case has been on trial. The Hibbitt case was filed in August of 2019, and so there is some discussion about whether they might have an affirmative motion to dismiss because of lack of jurisdiction if they could figure out a way to find a Delaware citizen in that chain, and it's a very complicated citizenship chain, to get that case and this case, candidly, out of federal court and into Georgia state court. And so there was a linking of those cases at the time, but it wasn't until January of 2020, after Judge Mays in the Hibbitt case, issues an order to show cause that requires Oxford Mall to detail in every level of detail, all the way down, who all the various citizens are. And so at that point, there's no evidence that in January of 2020, there was any sort of connection of the cases. In this case, it was the same person though, right, who was handling these issues? Yes, it was the same lawyer, Your Honor. So, I mean, the cases don't have to be connected if the same person is handling the citizenship inquiry for both cases. That's certainly true. I guess a couple of responses, Your Honor. The first is that I've never filed a motion for summary judgment where I've been thinking about what is the jurisdiction of the case. I'm focused on what the actual issues are in the case that are at summary judgment. And it's clear that at that time, the emails, I think it's supplemental appendix at six, or maybe it's nine, that at the time, Mr. Grovenstein believed that there was jurisdiction as of January 28th or January 26th of 2020. He believed that there was jurisdiction in both cases. But he learns about it in the context of this Hibbitt case. And of course, it takes two to tango, right? You've got in Hibbitt, they realize that there's a Delaware citizen that deprives the court of jurisdiction in that case, or at least that there may not be diversity. They're still researching at that point. There's an email that says Mr. Grovenstein, who was responsible for both cases, he says, it's not clear to me that Judge Mays has the court, has the law correct. He's not sure based on his understanding and his research, I guess his initial research, that Judge Mays could just sui sponte dismiss the case. So in Hibbitt, they determine there's a Delaware citizen deep down in this jurisdictional chain who is a member of that entity. Immediately, they go and file the case in Georgia State Court, and it deprives that court of jurisdiction. It is a plausible thing that he did not also at the same time say, we have a separate case against J.C. Penney, where everyone has been litigating for a year as if jurisdiction existed. There's nothing on the docket that makes him think about jurisdiction. Summary judgment has been filed. The case is sitting there. But what would show his intent, and to the court's question about bad faith, it is clear from the beginning of this case that they were looking in both J.C. Penney and in Hibbitt in September and October of 2019, that they did not want to have jurisdiction. They wanted to find a non-diverse party so that they could get the case in their home court that they believed, in Georgia State Court. They is an indefinite pronoun. It is. Sure. So Mr. Grovenstein and his colleagues at Oxford Mall LLC believed. But they didn't actually file anything suggesting this until they had been on the receiving end of unfavorable rulings on the summary judgment motion and the motion to reconsider the summary judgment motion ruling. Correct? It was several months after that. That's correct, Your Honor. That's what looks bad. Plus the Hibbitt, we're looking for this so we can get in state court, etc. That's what looks bad. Sure. I understand, Your Honor. And I guess just a couple of things to respond. One, the burden was on both sides. And this case had been going since April of 2019. In Oxford Mall's answer, this is document nine on the record, they answer that we are a Delaware LLC. We have three members, James M. Hull, who is a Georgia resident, a Georgia limited liability company, Hull, or partnership, Hull 2000. And then we have a Delaware entity LLC. So they've disclosed that. There's been discovery on the other side asking about who are the three members. They disclose it again. So everyone knows that there is some sort of Delaware connection. It's not enough, understandably, to go all the way down and figure out who the citizenship is. Unless you lose on summary judgment. In fairness, Your Honor, the summary judgment rulings, and I can find, it was in, let me see when the summary judgment rulings are. So the summary judgment rulings happen in September, August of 2020. It's not until April of 2021 that ultimately this is disclosed. And there's an explanation for it. There's a clear explanation if the court will allow and if the district court would have allowed Mr. Grevenstein's affidavit and not stricken it. And he explains what happened is. Perhaps they should have brought the affidavit at the time that the district court was deciding the issue though. Understandably, Your Honor. It was a strategic decision. I wasn't involved in the case at the time, but as I understand it, it was a strategic decision. The burden was on J.C. Penney to establish. The decision they did on purpose. Then when it didn't work out right, they want the court to let them undo it. He's also a lawyer, Your Honor. And so they were afraid about waiving privilege. But the point I guess here is. The lawyer, he should have known better. You're not going to win on the affidavit issue. I don't think. I'd be surprised. You're not going to win with me. Well, fair enough. And we candidly, we don't need it. I mean, the explanation was that that would explain it definitively, but even based on the evidence as it exists. Again, the district court applied a different standard than what the standard is. But if you're looking for conduct that is so egregious that it could only be committed in bad faith, it just doesn't make sense. Let me ask you this. Since you raised that as the standard, how does that intersect with or is that overlaid with the clear and convincing evidence standard? Sure. So clear and convincing evidence. And that's what this court has never held, I suppose, in a published opinion. Although most circuits have held that and the parties agree that that's what the standard should be. It should be highly probable. So in purchasing power, you're talking about highly probable based on subjective bad faith evidence. But there's a narrow... Highly probable that they did something intentionally, which we would all classify as bad faith. Highly probable that the conduct could have only been committed in bad faith. That's the narrow exception of purchasing power, Your Honor. All right. But the clear and convincing evidence standard applies to the historical facts, doesn't it? That's the historical fact. What's bad faith is a mixed question of fact and law. It is. Okay. So you can't apply preponderance of the evidence to a mixed question of fact and law because the law doesn't preponderate in the evidentiary sense. Everyone here agrees that it should be clear and convincing evidence, Your Honor. As to the historical facts or as to the subjective ultimate issue of bad faith? I think it has to be the latter, Your Honor. Okay. Then how is that? That's not the standard you just relied on and the standard that an earlier decision says it could only have been committed in bad faith. That's not clear and convincing evidence. That's the legal standard. And the clear and convincing evidence is the burden of proof. And so you have to show that legal standard by the burden of proof. But it doesn't even meet the preponderance evidence standard here, Your Honor. There's no evidence of intent in this record. Well, there's evidence of knowledge. There's evidence that it was used strategically in Hibbitt, or at least it was talked about strategically in Hibbitt. There is evidence. They found out about it there. And then they waited until they lost rulings here to bring it up. They waited, it would have been under that scenario, eight months after there were rulings. But I guess that's the point. If there had been this trump card that they believed that they held in their back pocket, they would have played it as soon as they lost. But the case was stayed because of bankruptcy. It was stayed several months after, like shortly after. So the case is stayed, then the court rules on summary judgment, then it goes to mediation and there's a stay because of mediation. But after losing at summary judgment, you would have played the trump card. There's no evidence of intent other than those things. Not if you thought you could mediate something successfully. Are you telling us if they had won on summary judgment, they would have disclosed this jurisdiction problem? I don't know what they would have done. Nobody asked that at any of the depositions? They never took Mr. Grevenstein's deposition and that's part of why they didn't submit the affidavit. But what happens after the mediation fails, there's reporting by the parties. There's an attempt by the other side to file an amended complaint. At that point, JCPenney is in bankruptcy. So there's a new entity. They're getting ready to go to trial. They're trying to figure out what the new entity sort of means and looks like. And he discovers, oh wait, this is a Delaware entity. Might we, do we also have a Delaware citizen? And then they disclose it. But there's, even if there's intent evidence, there is no evidence here that there was any sort of strategic advantage or that that was perceived. Are you familiar with our Skanska versus Bagel Heads case? I'm not. It was a maritime law case. So I can see why you wouldn't have come across it. But one issue at the end was there were spoliation sanctions issued because Skanska did not preserve any cell phones, even though they were under litigation hold. And the district court said that there was no cogent explanation for the company's failure to do that. And we affirmed that, saying that was the district court's factual finding. And we didn't see clear error in that finding. How is this really any different? The district court here said, I don't see any reason that there would have been a good faith way to make this decision. So why, isn't that the same? That case sounds a lot more like the standard case for sanctions, like the chambers, like the Supreme Court found in chambers. I mean, the examples that you see in the cases, both in chambers and in the cases cited by my friends on the other side, are repeated willful violations of court orders, violations of discovery orders, you know, egregious conduct with no sort of credible explanation. I see that my time has expired. May I finish answering your question, Your Honor? So secretly monitoring and intercepting emails, that's their Eagle Hospital case, or willful concealment of a key witness, that's their Higgs case. So in the same situation, if you're destroying tapes that would have been discoverable in discovery, maybe that meets the standard. Maybe that is something that is so egregious that it could only be explained by bad faith. Here, you're talking about, not that he knew that there was a lack of jurisdiction. He knew that there was a Delaware citizen deep within six levels down in his citizenship chain. I mean, a lawyer would know that that means that there's a lack of jurisdiction. It's possible— It's not a close question, is it? I do think it's actually somewhat of a close question here, because in this case in Inhibit, the entity is represented by two different outside lawyers. So it's not like your outside counsel can say, we're disclosing it in this case. Remember, we also have this case where we've been litigating. We need to disclose it in that case. This is a company where most of what they do is not litigation. They manage 15 million square feet of retail property. They have all sorts of issues that they're having to deal with. It was clear in January that they were scrambling to respond to Judge Mays's order. They say it in the emails because they have these six levels down, non-controlled entities. It is a rabbit hole because it is dozens and dozens and dozens and dozens of people and entities that they've got to run down, and he just didn't make the connection. It doesn't take but one. All they've got to do is find one. That's correct, and they found it in the Inhibit case, and what did they do? They immediately filed suit in Georgia State Court. If that had been their intent, clearly they wanted to get out of federal court. They probably had a statute of limitations problem, didn't they?  Let me ask you this. If the facts were that they knew about this diversity killing fact, but they held it to see how the court was going to handle the case and which way the wind was blowing, and then pulled it out, you would agree that's bad faith, would you not? I think the timing is very significant, and I think in that situation... No, no, that's not my question. I gave you that. How would you respond to it? Bad faith or good faith? Apologies, Your Honor. I think that's much closer to the bad faith standard. I think it's much closer. It is bad faith, is it not? You can go into a court and file a count or claim or claim, allege diversity, find out it's a misstatement. Let's be generous. Yes. And then hold it to see which way the case is going. And then if it goes against you, pull it out. That would be bad faith, Your Honor. Okay, so that's the question. Whether that's what they did or not. But perhaps it's the question, it was an eight-month delay. There was no sort of, oh man, we've lost. Here it is. You're arguing the factual question. I was just asking about the legal. Thank you, Your Honor. I'll reserve my time. Mr. Pruitt. Good morning. May it please the Court. David Pruitt for JCPenney. I'm going to go against my better judgment and go off script right out of the gates. The question concerning Mr. Brobenstein's knowledge and his understanding of the law is settled in the record at page eight of our sealed appendix, where on December 18th, he wrote an email explaining very clearly his understanding of how diversity jurisdiction works. 12-18, there's some more that day. December 18th, 2019. Okay. And that's appendix page eight. That's tab B of our sealed appendix. Mr. Brobenstein stated, my understanding is that to determine residency of a limited liability company or a partnership slash limited partnership, the courts ignore the state of organization and the state of principal place of business and look instead at the residency of all members or partners. The only thing that counts is the residency of the individual members or partners. And he goes on from there. And the district court had before it this and other emails where Mr. Brobenstein very clearly expressed his understanding, not only of the law, but of the consequences of the law. And that in the event that the court did not have jurisdiction, then the trial court would be required to vacate her rulings, which is exactly what they did. I'll try to back up and get back to the- So the district court's order finds that JCPenney also played a role in the delay in determining diversity jurisdiction. What is your understanding as to the actions that JCPenney should have taken, according to the district court, to avoid this delay in the first place? Your Honor, I'm not sure what JCPenney could have done. The information concerning this individual was non-public. We checked all public resources available, could find no indication of any non-diverse member. We filed a complaint pleading diversity jurisdiction. We immediately served discovery asking for the identity of all of the members and the members of the members. In response, we received a counterclaim from Oxford Mall invoking the diversity jurisdiction of the court and then amended counterclaim invoking the diversity jurisdiction of the court. And that, as far as we're concerned, settled it. Okay, so even though the district court eventually ruled in your favor, you would disagree with that portion of the district court's order in terms of JCPenney has no responsibility or accountability in terms of that issue? I'm biased, Your Honor, but yes, I would take issue with that itty-bitty part of the judge's ruling, yes, Your Honor. I think important in backing up is to recognize that the court's decision is subject to abuse of discretion, each of the decisions with one exception, and that's the finding of bad faith, which is subject to review for clear error. And as this court has explained, that deferential standard is appropriate, among other reasons, because the district court has such close management of a case from start to finish. And that's certainly what occurred here. The district court conducted, I think, six status conferences, ruled on cross motion for summary judgment, referee three discovery disputes. And then in this proceeding, as it related to jurisdiction, entertained numerous briefs at an in-person hearing and reviewed in camera our firm's legal fees before authoring two lengthy, well-reasoned opinions that, in our view, are due to be affirmed. Would you address purchasing powers could only be committed in bad faith language? Yes, Your Honor. I think as a starting point, I think that has to be read in the context of the burden of proof, which is clear and convincing. And so it translates to a highly probable standard, which is what the court applied. The trial court specifically found that it was highly probable that the defendant's conduct in this case was so egregious that Oxford Mall could only have committed it in bad faith. So the trial court followed that standard. I do think it is . . . . . . what you and the district court meant by it translates to highly probable. The language is it's so clear that it can't be anything but bad faith. Could only be committed in bad faith. It's so egregious. How does that get to it's highly probable it was bad faith? Your Honor, when read in the context of the burden of proof, which is highly probable, the two merge and you have to . . . The two merge to be some hybrid child? Yes, Your Honor. When the burden of proof is applied to that standard, the question is, is it highly probable that the defendant acted . . . Can't you have something that's highly probable even though it's not the only plausible alternative? I think, Your Honor, there's always going to be conflicting evidence. And even where the burden of proof is beyond a reasonable doubt, there's going to be conflicting evidence. There's going to be conflicting interpretations of that evidence. See, I thought that you would apply the burden of . . . We call it proof, but the burden of persuasion, burden going forward coupled with it, to find out what the historical facts are. Who, what, when, where, why. And then once you find that, it's sort of like summary judgment. You construe that that way. And then you decide whether those facts, having applied the burden of persuasion and proof, are so egregious it could only have been in bad faith. And I realize that kind of circled back and bites the subjective intent issue, but . . . But, Your Honor, the law in that area is unsettled. There's not a 11th Circuit opinion expressly addressing the clear and convincing standard as it's applied in this context. Our view of the law of the other circuits and other opinions of lower courts was that it would be a clear and convincing standard. I will say, though, that the language from the purchasing power case, as it relates to that only phraseology, it doesn't appear in all of the court's decisions. In fact, if you go back to the Chambers case, the Supreme Court case, what that court talks about is there are generally three exceptions where you can allow attorney fees shifting. One is the common fund. The other is disobedience. And then the third is bad faith, vexatious conduct, or oppressive reasons. And so at some point, maybe it's in the purchasing power case where that only language appears. But even after the purchasing power case, it doesn't always appear. So my take on it is, A, I think the lower court applied it correctly. But I also think it's important to read it into context. And in other situations, the court seems to paraphrase that language meaning tantamount to bad faith. Either way, at the end of the day, it comes down to, is there evidence before the lower court based on which the court could reasonably find bad faith? And certainly that's the case here when you're looking at it through the lens of an abuse of discretion standard or a clear error standard as it relates to the finding of bad faith. Can we talk about attorney's fees? How, I guess, what is your position in terms of how the district court calculated fees? I know that there's case law saying that the district court doesn't have to do a line by line review of everything that's itemized. But it also can't just give a blanket number. And in this case, it seems like the district court kind of did a little bit of both, which perhaps was inappropriate. Can you talk a little bit about that? Yes, Your Honor. Glad to do that. So, I think it's important first to kind of recognize what is part of the attorney fee award and what is not part of the attorney fee award. So, in terms of the life of this case, what is not included in the attorney fee award? All of the work in discovery, all of the depositions, the briefing on the motions for summary judgment, none of that is included. Where the judge found that the sanction should begin was March 5th, 2020, which is when Oxford Law filed the motion in the Hibbitts case. And so, now the judge could have inner discretion because she found that Mr. Grobenson knew about that non-diverse member back in January. She could have pulled it back to January 20th, but in her discretion and trying to show restraint, which is what the precedent says, she picked March 5th, 2020. And so, going forward from that date, what's included? Well, we received the ruling on the motion for summary judgment. We briefed a motion for reconsideration filed by the defendant. We have some status conferences. We have a mediation. And then just about immediately after the mediation, the defendant announces this, what they described as newly discovered or recently discovered information they'd actually had for almost a year and a half. But that's the period of information plus the sanctions proceeding. That's what's included within the damages period. And so, we calculated that. We submitted our invoices in camera to calculate what our fees were for that period. And it was, I think, about $93,000. And then the court, I think, could have, in its discretion, awarded all of that. But the defendant made the argument that, well, that briefing on the motion to reconsider, you know, that helped them in the state court proceeding that we ended up having to file. You know, there's part of that that gets put into the state court proceeding, which is correct. And so, what the judge did was say, well, to account for that, I'm going to take one third off of that $93,000 number, which is consistent, which is consistent with the Supreme Court's precedent in Goodyear, which expressly endorses the use of percentages in terms of allocation. And talks about, as Your Honor referenced, that the district court's not supposed to become an accountant. But that's something that the Supreme Court has endorsed. And then also, this court, in an unpublished decision that we cite in the Little Rest case, very similar argument by the defendants there, that, well, there are fees here that are duplicative. And what the lower court there did was make, I think it was a 20% reduction of the overall fees, which this court found to be within the lower court's discretion. And again, that's what this is. It's a discretionary decision. And the trial court had our fees in front of it, had our actual invoices in front of it, clearly went through them. And that was the judge's conclusion as to what was reasonable. And I submit that it is. Briefly touching on the, briefly touching on affidavit. It was filed after the hearing and after the judge found that Mr. Duggan's saying that affidavit may have failed. I think that the acknowledgement that the decision not to file that affidavit was strategic and significant. Under this court's precedent, a decision by a lower court to strike an affidavit is reviewed for abuse of discretion. And also the question there is, is it excusable neglect? And here, it's clear now it was a strategic decision and probably a wise decision in hindsight in his part. But in any event, the arguments then that the appellant makes about what Oxford Mall was thinking, what was happening behind the scenes, all that's in the affidavit that's been stricken. That now, I think based on the record here today, clearly should have been stricken because it was a strategic decision. It was not a matter of inadvertence. So that leaves the court with the record that the lower court had, which are emails that in our view would have frankly established, would have frankly satisfied either of the prongs set out in purchasing power, whether it be direct evidence of subjective bad faith or the second prong, which the trial court traveled under. I mean, what happened here is that Mr. Grovenstein and his colleague, Ms. Hatcher, were on a mission. We're on a mission to find a non-diverse member that would destroy diversity in both cases. There was a clear connection. And they talked about relocating our case. They talked about finding a resident in Texas, which is where JCPenney, not Hibbitts, is located. They even talked about, and this is in February, this is after they find the non-diverse defendant. There's a reference to a case authored by Judge Baldry, who is obviously the judge who was presiding over the JCPenney case. And it's interesting that the email references Judge Baldry as the judge in the Northern District of Alabama. Well, there are a lot of judges in the Northern District of Alabama, but she was the only one presiding over one of their cases. And keep in mind, they had two cases. This is not some large litigation docket. They had two cases and they were on a mission to find a non-diverse member in both of those cases. But doesn't that then weigh on the side of your friend who said it wasn't even in their interest to withhold this information? As you said, that was their mission. They had information that would support that goal or agenda and they didn't provide it, which was not to their interest. So how does that somehow, nevertheless, benefit them? Yes, Your Honor. So there were two different situations. In the Hibbitts case, nothing had happened. And so what did they do? In two days of finding this gentleman's name, they sued Hibbitts in Georgia State Court. They wait two months before they file a motion in the Hibbitts case. So they weren't in a rush to tell anybody about this. But in our case, it was a different scenario. Everything was done. As far as Oxford Mall knew, it was one ruling away from winning this case. So why would it pull the plug? It had a perfect situation where it could wait and see what happened. Kind of like what Mr. Grobenstein did with his affidavit. Wait and see what happened. And if the court rules in their favor, there's no way we'll ever know. If it rules against them, they can try to get reconsideration. If they get reconsideration, great. If they don't get reconsideration, try to negotiate a settlement. You know, if they can't get a settlement, then they play their card. That's exactly what they did and it worked absolutely to their advantage. Thank you for your time. Thank you. Mr. Boehner, you've got three minutes. And I'm going to ask you the same question in terms of the district court seems to take some responsibility for the delay in this discovery and assign some to J.C. Penney. What more does your client believe the court and J.C. Penney should have done? As to the amount of sanctions, Your Honor, or as to the threshold question of whether there could be sanctions? Whether there could be sanctions. So as to J.C. Penney, it could have been pushing on the discovery request that they filed where they know, as they say, Mr. Grovenstein knew what subject matter jurisdiction meant and what diversity meant. There are emails all throughout the record that suggest that maybe he didn't so much, but that same understanding has to be put on them. And the discovery responses only went one level down. And so they knew, based on those discovery responses, J.C. Penney knew that the discovery or the diversity issue was not resolved. And I suppose what the district court might have been envisioning, might have been envisioning what Judge Mays did to enter an order at the outset that was a show cause order that said, I don't believe that the parties have proven diversity. We're going to make them do it. Now, the admitted rule 7.1 that just went into effect in December of 2022 should fix this problem moving forward, that all the parties in the district courts have to confirm that at the earliest possible opportunity. But it wasn't here. And just a couple of, I guess, points here about the abuse of discretion standard. The district court never once engaged with these emails that were talking about, we want to get this case to Georgia State Court. It was against their interest to keep this case here. My friend on the other side talks about- But not once they had done all of that litigation, right? Once they had done all the litigate, done all that kind of briefing and things, wasn't it more in their interest to wait and see what happened and then make a call after that? Perhaps. There's absolutely nothing in the record that would inform that other than the fact of he knew a Delaware citizen was there. There was no contemporaneous connection to this case. There's no understanding that, hey, there's lack of subject matter jurisdiction in this case. They just knew that fact divorced from anything else. So there's no evidence in the record that they believe strategic, the delay would be some sort of strategic advantage. What about common sense? Can't we take account of that? I think we could, Your Honor. It's a difficult fact. All I can say is that there is no contemporaneous evidence at the time that they understood that we have this same issue, that there's two different parties. It matters in this case. It clearly only matters in this other case based on what the jurisdictional facts are of that defendant and they just didn't make that connection. I think that that's a fair reading of what the record shows based on what's in the record. The only explanation is not bad faith, that there is some sort of other explanation in light of the fact that the district court didn't give any sort of strategic advantage or didn't point to any evidence. One thing that I guess we will, that I'd like to talk about just briefly is about the Goodyear standard. This is exactly the kind of thing that Goodyear said that courts, district courts couldn't do. The language of Goodyear is that the district court has to assess and allocate specific litigation expenses, which didn't happen here. In fact, it's evidenced by this alleged reasonableness, determination of lopping off one third, even though Goodyear says you can't use sanctions to punish, you can't use sanctions. Which Goodyear are you talking about? Goodyear versus Hager or the other? The more recent Goodyear, the case about the amount of sanctions and what you can consider. So the district court applied too broad brush of a standard and should have considered each of the litigation expenses. Well, I believe that's Hager. And the court said, the Supreme Court said, the fee award may go no further than to redress the wrong party for losses sustained. It may not impose an additional amount of punishment for the sanctioned party's misbehavior. Now, as to the anything but bad faith standard that you argued for, court also said, to level that kind of separate penalty, something more than damages inflicted, a court would need to provide procedural guarantees applicable in criminal cases, such as a beyond a reasonable doubt standard of proof. When, as in this case, those criminal type protections are missing, a court shifting of fees is limited to reimbursing the victim, which strongly implies proof beyond a reasonable doubt isn't required in a damages case like this, as opposed to a criminal sanction that goes beyond the damages caused. And that seems to conflict with the has to be nothing but bad faith, no plausible alternatives to bad faith. The way that I square them, I guess, Your Honor, is that purchasing power talks about whether sanctions can be imposed. And the language that Your Honor is reading is talking about the amount of sanctions that could be imposed. And in this case, the district court said that- Well, the clear, to provide procedural guarantees applicable in criminal cases, which aren't in civil, such as beyond a reasonable doubt standard. We know that anything that approaches, or anything that matches or goes beyond beyond a reasonable doubt isn't required in civil cases because the Supreme Court's warning you that if you inflict more than the damages suffered, some extra penalty, you've got to go beyond a reasonable doubt. And in this case, they didn't inflict anything more than the damages suffered, or a reasonable estimate of it. Well, it applied to broad brush. I mean, it went from a temporal restriction and moving forward. And that's what I understand Goodyear to say you can't do unless it's an exceptional case. And if it is an exceptional case, which I don't think that this is, if it is, then they should have, the district court should not have stricken Wayne Grubenstein's affidavit because it goes directly to that question. I see my time has expired, Your Honor. Thank you. It's been a month, but thank you. We'll move to our final case of the day.